IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

RECAI ISKENDER,



INDEX NO.
ECF CASE

13 CIV 2899

**JUDGE ABRAMS**

                    Plaintiff,      :

                                   :

               - against -      :

                                   :

**JURY TRIAL DEMANDED**

THE CITY OF NEW YORK, a municipal entity,  :
NEW YORK CITY CAPTAIN SORENSON,  :
NEW YORK CITY SERGEANT CESERI,  :
NEW YORK CITY POLICE OFFICER JOSE  :    **COMPLAINT**
PEDROZA, NEW YORK CITY POLICE  :
OFFICER TROMBETTA, NEW YORK CITY  :
POLICE OFFICER YELLER, NEW YORK  :
CITY POLICE OFFICERS "OWS EVICTION  :
OFFICERS", NEW YORK CITY POLICE  :
OFFICERS "JOHN DOES 1-8," NEW YORK  :
CITY SERGEANTS "JOHN AND JANE DOES  :
9-11," BROOKFIELD OFFICE PROPERTIES,  :
and EMPLOYEES OF BROOKFIELD OFFICE  :
PROPERTIES "JOHN DOES 1-2"  :

                                   :

                    Defendants.   :

                                   :

-------------------------------------------------------------------X

      Plaintiff Recai Iskender, by his attorneys, Stecklow Cohen & Thompson,

complaining of the defendants, respectfully alleges as follows:

## I.    PRELIMINARY STATEMENT

      1.    Plaintiff Recai Iskender brings this action for compensatory damages,

punitive damages, and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988

for violations of his civil rights, as said rights are secured by said statutes and the

Constitutions of the State of New York and the United States.

2.      On or about November 15th, 2011 at or around 1:00am, Plaintiff Recai Iskender was present in Zuccotti Park in support of Occupy Wall Street ("OWS"). OWS began on September 17, 2011 and is a movement that, *inter alia,* protests the institutionalized inequality in this country that funnels almost all the nation's political power, wealth and resources to a tiny fraction of people and their corporations, and denies the vast majority of ordinary Americans their fair share. Several Defendant POLICE OFFICERS "OWS EVICTION OFFICERS" invaded Zuccotti Park, subjecting Plaintiff Recai Iskender and other peaceful demonstrators to excessive force. Specifically, the Defendant POLICE OFFICERS, *inter alia*, repeatedly punched, struck, and dragged Plaintiff across the ground. The Defendant POLICE OFFICERS "OWS EVICTION OFFICERS" handcuffed and arrested Plaintiff. Plaintiff Recai Iskender was detained in the Defendant POLICE OFFICERS' "OWS EVICTION OFFICERS" custody for approximately fourteen (14) hours. The Defendant POLICE OFFICERS "OWS EVICTION OFFICERS" issued Plaintiff a Desk Appearance Ticket, charging him with Disorderly Conduct and Trespassing, offenses that he did not commit. Plaintiff was forced to appear before the Court on two (2) occasions to answer the Defendant' baseless charges. All charges were adjourned in contemplation of dismissal and dismissed approximately six (6) months later.

3.      On May 26th, 2012, at or around 5:00pm, Plaintiff Recai Iskender was in the Dyckman Street subway station in Manhattan, New York. Plaintiff Recai Iskender was lawfully using a video camera to record police activity when the Defendant POLICE OFFICERS "John Does 1-5" approached Plaintiff and demanded that he stop doing so. Plaintiff Recai Iskender was not engaging in any illegal activity; nonetheless, the

Defendant POLICE OFFICERS "John Does 1-5" tackled and repeatedly struck and punched Plaintiff Recai Iskender. The Defendant POLICE OFFICERS "John Does 1-5" issued Plaintiff Recai Iskender a summons for an offense that he did not commit. Plaintiff Recai Iskender was forced to appear before the Court to answer the Defendants POLICE OFFICERS' "John Does 1-5" baseless charges. All charges were dismissed.

4.      On or around July 18th, 2012 Plaintiff Recai Iskender was in Zuccotti Park with live-streaming equipment. Though the November 15th, 2011 illegal night-time raid described herein had already forced Plaintiff and other peaceful and non-violent OWS protestors out of the park, Plaintiff and other OWS participants still utilized the park to gather and discuss, *inter alia,* the movement's progress and plans. Plaintiff was using his live-streaming equipment to record activity in and around the park. Plaintiff began recording the Defendant BROOKFIELD OFFICERS "John Does 1-2." The Defendant BROOKFIELD OFFICERS "John Does 1-2" told Plaintiff to stop recording and thereafter, with intent, damaged his live-streaming equipment. Defendant CAPTAIN SORENSON threatened to arrest Plaintiff. Defendant CAPTAIN SORENSON falsey told Plaintiff that his belongings were lawfully destroyed, due to his act of recording police conduct.

5.      On or around July 28th, 2012 at or around 11:00am Plaintiff Recai Iskender was inside the Wall Street subway station in Manhattan, waiting for a northbound 2 or 3 Train. The Defendant POLICE OFFICERS "John Does 6-8" walked onto the same train car as Plaintiff Recai Iskender and began asking him questions about the recording and video equipment that he was carrying. The Defendant POLICE OFFICERS "John Does 6-8" grabbed Plaintiff Recai Iskender and forced him off of the

train, thereafter repeatedly striking and punching Plaintiff, along with throwing him against a glass panel within the Chambers Street subway station. The Defendant POLICE OFFICERS "John Does 6-8" issued Plaintiff Recai Iskender a summons for Disorderly Conduct, an offense that he did not commit. Plaintiff was forced to appear before the Court on two (2) occasions to answer the Defendant POLICE OFFICERS' "John Does 6-8" baseless charges. All charges were dismissed.

## II.    JURISDICTION

6.    This action is brought pursuant to 42 U.S.C.  §§ 1983 and 1988, and the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) and the aforementioned statutory and constitutional provisions.

7.    Plaintiff Recai Iskender further invokes this Court's supplemental jurisdiction, pursuant to 28 USC.  § 1367, over any and all State law claims and causes of action.

8.    Plaintiff Recai Iskender has complied with N.Y. General Municipal Law §50-E by serving a notice of claim upon the Defendants within ninety (90) days of the date of the incidents described herein. More than thirty (30) days have elapsed since said claim was presented and the claim has not been satisfied.

## III.    VENUE

9.    Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C.  § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

## IV.    JURY DEMAND

4

10. Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## V. THE PARTIES

11. Plaintiff Recai Iskender is an American citizen and is currently a resident of Cliffside Park, New Jersey.

12. In compliance with the Southern District's "Plan for Certain § 1983 Cases Against the City of New York," attached hereto as **Exhibit "A"** are three executed § 160.50 releases for Plaintiff Recai Iskender.

13. Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

14. Defendant THE CITY OF NEW YORK maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, THE CITY OF NEW YORK.

15. The Defendant "OWS EVICTION POLICE OFFICERS" refers to members of the New York Police Department who violated Plaintiff Recai Iskender's constitutional rights at Zuccotti Park on November 15, 2011 in the manner described herein.

16. The Defendant POLICE OFFICERS "John Does 1-5" refers to the Defendant POLICE OFFICERS who violated Plaintiff Recai Iskender's constitutional

rights at the Dyckman Street subway station on May 26h, 2012 in the manner described herein.

17.     Upon information and belief, one of the Defendant POLICE OFFICERS "John Doe 1-5" was Defendant POLICE OFFICER JOSE PEDROZA.

18.     The Defendant POLICE OFFICERS "John Does 6-8" refers to the Defendant POLICE OFFICERS who violated Plaintiff Recai Iskender's constitutional rights at the Wall Street and Chambers Street subways stations on July 28th, 2012 in the manner described herein.

19.     Upon information and belief, one of the Defendant POLICE OFFICERS "John Does 6-8" was Defendant POLICE OFFICER YELLER.

20.     Upon information and belief, one of the Defendant POLICE OFFICERS "John Does 6-8" was Defendant POLICE OFFICER TROMBETTA.

21.     The Defendant POLICE SERGEANTS "John Does 9-11" refers to the Defendant POLICE OFFICERS who violated Plaintiff Recai Iskender's constitutional rights in the manner described herein.

22.     Upon information and belief, one of the Defendant POLICE SERGEANTS "John and Jane Does 9-11" was Defendant POLICE SERGEANT CESERI.

23.     Upon information and belief, one of the Defendant POLICE SERGEANTS "John and Jane Does 9-11" was a female.

24.     At all times, Defendant CAPTAIN SORENSON, Defendant POLICE OFFICER JOSE PEDROZA, Defendant POLICE OFFICER TROMBETTA, Defendant POLICE OFFICER YELLER, Defendant POLICE SERGEANT CESERI, Defendant

OWS EVICTION OFFICERS, the Defendant POLICE OFFICERS "John Does 1-8,",

and the Defendant POLICE SERGEANTS " John and Jane Does 9-11," (collectively,

unless referred to as otherwise, "the Defendant POLICE OFFICERS" or individually

"Defendant POLICE OFFICER"), were duly sworn police officers of said department

and were acting under the supervision of said department and according to their official

duties.  Plaintiff Recai Iskender asserts his claims against Defendants in both their official

and individual capacities.

25.    Plaintiff Recai Iskender will amend this complaint to name the Defendant

OWS EVICTION OFFICERS, the Defendant POLICE OFFICERS "John Does 1-8", and

the Defendant POLICE SERGEANTS " John and Jane Does 9-11" as further information

regarding their identities becomes available to Plaintiff.

26.    At all times, Defendant CAPTAIN SORENSON was a duly sworn police

officer of said department was acting under the supervision of said department and

according to his official duties. Plaintiff asserts his claim against Defendant SORENSON

in both his official and individual capacities.

27.    At all times relevant to this action, all of the Defendant POLICE

OFFICERS, either personally or through their employees, were acting under color of

state law and/or in compliance with the official rules, regulations, laws, statutes, customs,

usages and/or practices of the State or City of New York.

28.    Each and all of the acts of the Defendant POLICE OFFICERS alleged

herein were done by said defendants while acting within the scope and in furtherance of

their employment by Defendant THE CITY OF NEW YORK.

29.     Defendant BROOKFIELD OFFICE PROPERTIES is a business entity registered to do business and in fact doing business in the State of New York. Brookfield is the property owner of Zuccotti Park, formerly known as Liberty Park. Zuccotti Park is a publicly accessible open area, which it or a predecessor in ownership was required by Defendant THE CITY OF NEW YORK to build and maintain for public use.

30.     At all times relevant, Defendant BROOKFIELD PROPERTIES SECURITY held themselves out as responsible for maintaining public order in the public park called Zuccotti Park.

31.     The Defendant BROOKFIELD OFFICERS "John Does 1-2" were at all times relevant employees and or agents of Defendant BROOKFIELD OFFICE PROPERTIES.

## VI.     FACTS COMMON TO ALL CLAIMS

32.     In the autumn of 2011, Plaintiff became involved in the Occupy Wall Street ("OWS") movement.

33.     OWS began on September 17, 2011 and is a movement protesting the institutionalized inequality in this country that funnels almost all the nation's political power, wealth and resources to a tiny fraction of people and their corporations, and denies the vast majority of ordinary Americans their fair share.

34.     Occupy Wall Street consists of a large number of people nationwide who share a common consensus that American society is structured in a way that unfairly benefits the rich and powerful at the expense of ordinary people.

35.     Negative consequence of this structure include income inequality, poverty, mass imprisonment of citizens, offensive wars, environmental degradation, taxpayers

paying for the mistakes of reckless corporations, and undue influence of corporations on government.

36.     Those involved with Occupy Wall Street share the belief that change is possible through peaceful protest.

37.     Plaintiff was a participant in the Occupy Wall Street movement.

38.     Plaintiff had been working as a "live-streamer" on behalf of OWS.

39.     Live-streaming describes the process of filming events and/or activities at one or more locations while concurrently allowing individual users/and or groups —— through the use of the internet —— to view those same events and/or activities from other locations in real time.

40.      Live-streaming is a form of journalistic expression that has played an important role in furthering the OWS movement, in that it enables immediate and unfiltered coverage of OWS events, to reach significant numbers of individuals around the world.

<u>THE DEFENDANT POLICE OFFICERS SUBJECT PLAINTIFF TO RETALIATORY UNLAWFUL ARREST AND EXCESSIVE FORCE ON NOVEMBER 15th, 2011</u>

41.     On November 15th, 2011, Plaintiff was present within Zuccotti Park (alternatively, "the Park"), in support of OWS.

42.     OWS had been using Zuccotti Park as its main encampment since the movement's beginning, September 17, 2011.

43.     Masses of police officers in military style gear surged into the Park.

44.     At or around 1:00am, loud noise began emanating from throughout Zuccotti Park.

45.     The Defendant OWS EVICTION OFFICERS made their presence known by using sound cannons.

46.     Sound cannons are used to control crowds by projecting high-decibel sound, causing disabling pain and confusion in the targets.

47.     Sound cannons are formerly known as Long Range Acoustic Devices ("LRAD"), developed by the LRAD Corporation.[1]

48.     Sound cannons can cause substantial or permanent hearing loss.[2]

49.     The Defendant OWS EVICTION OFFICERS used standing light to disorient the protestors and prevent filming.

50.     The Defendant OWS EVICTION OFFICERS were dressed in riot gear; to wit, helmets, vests, and metal batons that they repeatedly used to strike peaceful and non-violent OWS demonstrators.

51.     The Defendant OWS EVICTION OFFICERS used military style tactics to force consistently peaceful and non-violent OWS demonstrators out of Zuccotti Park.

52.     The Defendant OWS EVICTION OFFICERS utilized a highly-coordinated pre-textual "cleaning" of Zuccotti Park.

53.     The Defendant OWS EVICTION OFFICERS' "cleaning" of Zuccotti Park was, in actuality, a full-on raid of the park, authorized by Defendant THE CITY OF

_____

[1] Baldwin, Roberto, "What is the LRAD Sound Cannon?" Gizmodo, November 17, 2011
Article incorporated by reference herein and available online at:
http://gizmodo.com/5860592/what-is-the-lrad-sound-cannon
[2] Id.

NEW YORK, and conducted in order to remove Plaintiff and other OWS demonstrators from the park, along with all of their possessions and belongings.

54.     As the raid began, the OWS EVICTION OFFICERS excluded journalist from viewing range of the violent police invasion.

55.     The Defendant OWS EVICTION OFFICERS acted to prevent OWS live-streamers and other journalists from capturing the constitutionally-violative actions that NYPD officers' had repeatedly carried out against peaceful and non-violent OWS demonstrators from the movement's inception, September 17, 2011.

56.     The Defendant OWS EVICTION OFFICERS grabbed a number of peaceful and non-violent OWS demonstrators and dragged them across the ground.

57.     Several of the Defendant OWS EVICTION OFFICERS, without warning, tackled Plaintiff to the ground.

58.     The Defendant OWS EVICTION OFFICERS did not issue Plaintiff any sort of order before tackling him to the ground, nor did they identify a need for using force against Plaintiff.

59.     The Defendant OWS EVICTION OFFICERS began repeatedly striking and punching Plaintiff.

60.     The Defendant OWS EVICTION OFFICERS applied said blows to various points of Plaintiff's body, including, but not limited to: Plaintiff's head, back, and arms.

61.     The Defendant OWS EVICTION OFFICERS began dragging Plaintiff, facedown, by his hands and feet across the ground.

62.     This caused Plaintiff significant and painful injuries.

11

63.     This caused Plaintiff's pants and underwear to fall down, causing Plaintiff further embarrassment and humiliation.

64.     Plaintiff suffered an injury to his genitals as a result of the Defendant EVICTION OFFICERS' act of dragging him across the ground with his pants and underwear down.

65.     The Defendant OWS EVICTION OFFICERS picked up Plaintiff and thereafter intentionally dropped him, facedown, onto the ground.

66.     The Defendant OWS EVICTION OFFICERS moved Plaintiff to a nearby bus.

67.     The Defendant OWS EVICTION OFFICERS handcuffed and arrested Plaintiff.

68.     The Defendant OWS EVICTION OFFICERS placed Plaintiff within the bus.

69.     There the Defendant OWS EVICTION OFFICERS would detain Plaintiff, as well as approximately forty (40) other peaceful and non-violent OWS demonstrators, for approximately seven (7) hours.

70.     The Defendant OWS EVICTION OFFICERS did not permit Plaintiff to use the bathroom during these seven (7) hours, nor did they, at any point, remove his handcuffs.

71.      The Defendant OWS EVICTION OFFICERS transported Plaintiff and the other peaceful and non-violent OWS demonstrators to One Police Plaza.

72.     The Defendant OWS EVICTION OFFICERS held Plaintiff and other peaceful and non-violent OWS demonstrators in a yard area outside of One Police Plaza for approximately one (1) hour.

73.     The Defendant OWS EVICTION OFFICERS detained Plaintiff in a holding cell within One Police Plaza for approximately six (6) hours.

74.     Said holding cell was overcrowded, dirty, and cold.

75.     The Defendant OWS EVICTION OFFICERS released Plaintiff with a Desk Appearance Ticket, charging him with violating P.L. § 240.20, Disorderly Conduct and P.L. §140.05, Criminal Trespass in the Fourth Degree.

76.     Plaintiff committed neither offense, nor any other violation or crime.

77.     Nonetheless, Plaintiff was forced to appear before the court on or around January 24th, 2012 to answer to the Defendant OWS EVICTION OFFICERS' baseless charges against him.

78.     Plaintiff was forced to appear before the Court on or around July 23rd, 2012 to answer the Defendant OWS EVICTION OFFICERS' baseless charges against him.

79.     All charges against Plaintiff were adjourned in contemplation of dismissal on the same day, July 23rd, 2012.

80.     All charges against Plaintiff were dismissed on or around January 23rd, 2013.

THE DEFENDANT POLICE OFFICERS SUBJECT PLAINTIFF TO RETALIATORY UNLAWFUL ARREST AND EXCESSIVE FORCE ON MAY 26th, 2012

81.     On May 26, 2012 at or around 5:00pm, Plaintiff was on the platform of the Dyckman Street Subway Station in Manhattan.

82.     Plaintiff, as well as two minors whom Plaintiff believed to be Hispanic, were seated on one of the platform's benches.

83.     The Defendant POLICE OFFICERS "John Does 1-5" approached the minors and asked them for their IDs.

84.     The minors were not engaged in any illegal conduct.

85.     Upon information and belief, the Defendant POLICE OFFICERS "John Does 1-5" had no reason to believe that the minors had committed or were about to engage in illegal conduct.

86.     Nonetheless, the Defendant POLICE OFFICERS "John Does 1-5" asked the minors repeated questions.

87.     Plaintiff, believing that the Defendant POLICE OFFICERS "John Does 1-5" were violating the minors' constitutional rights, began using his cell phone to record the interaction between the Defendant POLICE OFFICERS "John Does 1-5" and the minors.

88.     One of the Defendant POLICE OFFICERS "John Does 1-5" turned to Plaintiff and stated, in sum and substance, "Why are you filming like that? Stop filming."

89.     Plaintiff responded, in sum and substance, "I'm just exercising my First Amendment Protected Rights."

90.     As part of his work as a live-streamer, Plaintiff makes efforts to document unlawful police conduct in order to raise the general public's awareness of same.

91.     Upon information and belief, the same Defendant POLICE OFFICER "John Does 1-5" ordered Plaintiff to stop filming because he, the Defendant POLICE OFFICER "John Doe 1-5", was following Defendant THE CITY OF NEW YORK's and the New York City Police Department's policy, practice, or custom of harassing and/or arresting onlookers documenting and/or commenting upon police activity.

92.     This custom, policy, and/or practice has continued despite the consent decree entered into by Defendant THE CITY OF NEW YORK in Black v. Codd, 73 Civ. 5283 (S.D.N.Y. June 1, 1977), attached hereto as **Exhibit "B."**

93.     Plaintiff's act of recording of the Defendant POLICE OFFICERS' "John Does 1-5" interaction with the minors did not endanger the safety of the officers nor any of the other persons present.

94.     Plaintiff's act of recording did not give the Defendant POLICE OFFICERS "John Does 1-5" reasonable belief that recording their conduct was endangering anyone's safety.

95.     Plaintiff's act of recording the Defendant POLICE OFFICERS' "John Does 1-5" conduct was at all times legal.

96.     At or around this time, the same Defendant POLICE OFFICER "John Does 1-5" began reaching for Plaintiff's cell phone, in attempts to dispossess Plaintiff of same.

97.     Plaintiff reiterated that he was exercising his First Amendment Protected rights.

15

98.    The same Defendant POLICE OFFICER "John Doe 1-5" stated to Plaintiff, in sum and substance, "Now I'm going to teach you a lesson. Don't Move. Wait here."

99.    The same Defendant POLICE OFFICER "John Does 1-5" left the area then returned along with additional Defendant POLICE OFFICERS "John Does 1-5".

100.    The Defendant POLICE OFFICERS "John Does 1-5" huddled together and subsequently rushed and tackled Plaintiff.

101.    The Defendant POLICE OFFICERS "John Does 1-5" began repeatedly striking and punching Plaintiff.

102.    The Defendant POLICE OFFICERS "John Does 1-5" subjected Plaintiff to additional physically aggressive and forceful maneuvers, including but not limited to: forcing Plaintiff's arms behind his back in apparent attempts to break them.

103.    The Defendant POLICE OFFICERS' "John Does 1-5" attack caused Plaintiff significant and painful injuries.

104.    The Defendant POLICE OFFICERS "John Does 1-5" took Plaintiff's cell phone from him.

105.    The Defendant POLICE OFFICERS "John Does 1-5" deleted one or more videos from Plaintiff's cell phone.

106.    The Defendant POLICE OFFICERS "John Does 1-5" handcuffed Plaintiff.

107.    The Defendant POLICE OFFICERS "John Does 1-5" applied said handcuffs too tightly, causing Plaintiff pain and discomfort to his hands and wrists.

108.    The Defendant POLICE OFFICERS "John Does 1-5" walked Plaintiff toward the exit of the Dyckman Street Subway Station.

109.    There the Defendant POLICE OFFICERS "John Does 1-5" detained Plaintiff for approximately one (1) hour.

110.    During the hour the Defendant POLICE OFFICERS "John Does 1-5" repeatedly asked Plaintiff questions.

111.    During the hour, one or more of the Defendant POLICE OFFICERS "John Does 1-5" stated to Plaintiff, in sum and substance, "Let this be a lesson."

112.    The Defendant POLICE OFFICERS "John Does 1-5" issued Plaintiff a summons for violating P.L. §240.20, Disorderly Conduct.

113.    Defendant POLICE OFFICER JOSE PEDROZA signed the summons.

114.    Plaintiff Recai Iskender did not engage in Disorderly Conduct, or any other violation or crime.

115.    Nonetheless, Plaintiff was forced to appear before the Court on or around August 8, 2012.

116.    The Defendant POLICE OFFICERS' "John Does 1-5" baseless charge against Plaintiff was dismissed on the same day, August 8, 2012.

<u>THE DEFENDANT POLICE OFFICERS VIOLATE PLAINTIFF'S<br>CONSTITUTIONAL RIGHTS ON OR AROUND JULY 18TH, 2012</u>

117.    On or around July 18th, 2012, Plaintiff was in Zuccotti Park with live-streaming equipment, including but not limited to an iPad.

118.    The Defendant BROOKFIELD OFFICERS "John Does 1-2" were nearby.

17

119.    Plaintiff used said live-streaming equipment in order to record BROOKFIELD OFFICER "John Doe 1."

120.    The Defendant BROOKFIELD OFFICERS "John Does 1-2" told Plaintiff to stop filming.

121.    The Defendant BROOKFIELD OFFICERS "John Does 1-2" approached Plaintiff.

122.    The Defendant BROOKFIELD OFFICERS "John Does 1-2" seized Plaintiff's live-streaming equipment, including but not limited to his iPad.

123.    The Defendant BROOKFIELD OFFICERS "John Does 1-2" punched Plaintiff's hands to dislodge Plaintiff's iPad.

124.    The Defendant BROOKFIELD OFFICERS "John Does 1-2" grabbed Plaintiff's iPad, and threw it onto the ground.

125.    The Defendant BROOKFIELD OFFICERS "John Does 1-2" repeatedly kicked Plaintiff's iPad.

126.    Defendant CAPTAIN SORENSON was present throughout some or all of the Defendant BROOKFIELD OFFICERS' "John Does 1-2" interaction with Plaintiff.

127.    Defendant CAPTAIN SORENSON falsely told Plaintiff that it was unlawful to record police conduct.

128.    Defendant CAPTAIN SORENSON threatened to arrest Plaintiff.

129.    One of the Defendant POLICE SERGEANTS "John and Jane Does 9-11" arrived on the scene.

130.    One of the Defendant POLICE SERGEANTS "John and Jane Does 9-11" threatened to arrest Plaintiff.

131.    One of the Defendant POLICE SERGEANTS "John and Jane Does 9-11" told Plaintiff that he should not be filming.

132.    Due to the actions of the Defendant BROOKFIELD OFFICERS, Plaintiff's live-streaming equipment, including but not limited to his iPad, was damaged.

133.    Due to the actions of the Defendant BROOKFIELD OFFICERS, Plaintiff suffered a deprivation of his constitutional rights, and was forced to pay out-of-pocket expenses in order to have his iPad repaired.

<u>THE DEFENDANT POLICE OFFICERS SUBJECT PLAINTIFF TO RETALIATORY UNLAWFUL ARREST AND EXCESSIVE FORCE ON JULY 28th, 2012</u>

134.    On July 28th, 2012, at or around 11:00pm Plaintiff was inside the Wall Street subway station in Manhattan, New York.

135.    Plaintiff was carrying live-streaming equipment.

136.    The Defendant POLICE OFFICERS "John Does 6-8" were in the same station.

137.    The Defendant POLICE OFFICERS "John Does 6-8" asked Plaintiff why he was filming the subway station.

138.    Plaintiff replied that he was not filming.

139.    The Defendant POLICE OFFICERS "John Does 6-8" again asked Plaintiff the same question, to which Plaintiff again stated that he was not filming.

140.    The Defendant POLICE OFFICERS "John Does 6-8" continued asking Plaintiff why he was filming, insisting that they only wanted to ask him a few questions.

141.    Plaintiff told the Defendant POLICE OFFICERS "John Does 6-8" that he would not answer their questions, and told them to speak with his lawyer.

19

142.    Plaintiff stepped onto the recently-arrived northbound 2 Train and took a seat on same.

143.    The Defendant POLICE OFFICERS "John Does 6-8" stepped onto the same car of the same train.

144.    The Defendant POLICE OFFICERS "John Does 6-8" approached Plaintiff and stood over him.

145.    Plaintiff reiterated to the Defendant POLICE OFFICERS "John Does 6-8" that they would have to speak with his lawyer.

146.    One of the Defendant POLICE OFFICERS "John Does 6-8" derisively stated to Plaintiff, in sum and substance, "Oh, you're big shot now."

147.    The Defendant POLICE OFFICERS "John Does 6-8" yelled intimidatingly at Plaintiff.

148.    At or around this time, the train pulled into the Chambers Street subway station.

149.    The Defendant POLICE OFFICERS "John Does 6-8" grabbed Plaintiff and dragged him off of the train.

150.    The Defendant POLICE OFFICERS "John Does 6-8", without warning and without reason, began repeatedly punching and striking Plaintiff.

151.    The Defendant POLICE OFFICERS "John Does 6-8" slammed Plaintiff up against a glass panel within the Chambers Street subway station.

152.    The Defendant POLICE OFFICERS' "John Does 6-8" actions caused Plaintiff significant and painful injuries.

20

153.    The Defendant POLICE OFFICERS "John Does 6-8" seized Plaintiff's wallet and other personal belongings.

154.    The Defendant POLICE OFFICERS "John Does 6-8" handcuffed Plaintiff.

155.    Plaintiff asked the Defendant POLICE OFFICERS "John Does 6-8", in sum and substance, "What am I being charged with?"

156.    One of the Defendant POLICE OFFICERS "John Does 6-8" stated, in sum and substance, "You're being arrested because you didn't want to talk with us."

157.    Plaintiff asked, in sum and substance, "Can I speak with your supervisor?"

158.    The Defendant POLICE OFFICERS " John Does 6-8" called over one of the DEFENDANT POLICE SERGEANTS "John and Jane Does 9-11", who was nearby.

159.    Plaintiff asked the same Defendant POLICE SERGEANTS "John and Jane Does 9-11", in sum and substance, "What's the charge?"

160.    One of the Defendant POLICE SERGEANTS "John and Jane Does 9-11" stated to Plaintiff, in sum and substance, "If you refuse to speak to police then you'll get arrested."

161.    One of the Defendant POLICE OFFICERS "John Does 6-8" stated to Plaintiff, in sum and substance, "Do not film the police again."

162.    The Defendant POLICE OFFICERS "John Does 6-8" issued Plaintiff a summons for violating P.L. §240.20(1), Disorderly Conduct, "Disobeying lawful order to exit train."

163.    Defendant POLICE OFFICER TROMBETTA signed the summons.

21

164.    Plaintiff did not engage in disorderly conduct, or any other violation or crime.

165.    Nonetheless, Plaintiff was forced to appear before the Court on or around October 4th, 2012, to answer the Defendant POLICE OFFICERS' "John Does 6-8" baseless charge.

166.    Plaintiff was forced to appear before the Court on or around November 8th, 2012, to answer the Defendant POLICE OFFICERS' "John Does 6-8" baseless charge.

167.    All charges against Plaintiff were dismissed on the same date, November 8th, 2012.

168.    Upon information and belief, the Defendant POLICE OFFICERS present for each of the interactions with Plaintiff, knew at the time they arrested and/or issued Plaintiff a summons that they lacked probable cause to do so.

169.    Upon information and belief, the Defendant POLICE OFFICERS present for each of the interactions with Plaintiff arrested and/or issued Plaintiff a summons, at least in part, to meet prescribed quantitative productivity goals.

170.    Upon information and belief, each of the charges brought against Plaintiff by the Defendant POLICE OFFICERS' were "contempt of cop" and/or "cover charges."

171.    Upon information and belief,  "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration are relatively easy for police to levy in the absence of actual probable cause because they may arise out of nearly any police-civilian interactions.

172.    Upon information and belief, "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental

administration are relatively easy for police to levy in the absence of actual probable cause because they can be levied solely upon the allegations of the arresting officer(s) without reference to physical evidence or witness observation of criminal acts.

173.    Upon information and belief, to date, Defendant THE CITY OF NEW YORK has not implemented any particular, training, oversight measures or policies designed or intended to curtail the improper use by New York City POLICE OFFICERS of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

174.    During all of the foregoing wrongful acts committed against Plaintiff, not one of the Defendant POLICE OFFICERS intervened on Plaintiff's behalf so as to prevent the violation of Plaintiff's constitutional rights, despite having realistic opportunities to do so.

175.    As a result of the foregoing, Plaintiff sustained, *inter alia*, physical injuries, physical pain, mental injuries, emotional distress, embarrassment, humiliation, out of pocket expenses, loss of liberty, loss of standing within his community, and deprivation of his constitutional rights.

176.    As a result of the foregoing, Plaintiff demands judgment against Defendants in an amount of money to be determined at trial.

## FEDERAL CLAIMS

### FIRST CLAIM FOR RELIEF

### DEPRIVATION OF FEDERAL CIVIL RIGHTS
### UNDER 42 U.S.C. § 1983

177.    Defendant THE CITY OF NEW YORK and the Defendant POLICE OFFICERS (collectively, "Defendants") deprived Plaintiff of the rights, privileges and

immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

178.    The Defendant POLICE OFFICERS acted in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto, pursuant to the customs, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

179.    Defendant THE CITY OF NEW YORK and the New York City Police Department are responsible for the actions of their employees under the doctrine of Monell v. City of New York Department of Social Services, 436 U.S. 658 (1978), and/or the doctrine of *respondeat superior*.

180.    As a result of the foregoing, Plaintiff sustained, *inter alia*, physical injuries, physical pain, mental injuries, emotional distress, embarrassment, humiliation, out of pocket expenses, loss of liberty, loss of standing within his community, and deprivation of his constitutional rights.

181.    Accordingly, Plaintiff seeks compensation in an amount to be determined at trial.

SECOND CLAIM FOR RELIEF

VIOLATION OF PLAINTIFF'S FOURTH AMENDMENT RIGHTS
UNDER 42 U.S.C. §1983
ARISING FROM DEFENDANTS' WARRANTLESS ARRESTS WITHOUT
PROBABLE CAUSE

24

182.    The Defendant POLICE OFFICERS, on multiple occasions, arrested Plaintiff detained him within their custody, despite having neither a warrant nor probable cause for his arrest, for a total of approximately sixteen (16) hours, those dates and durations were as follows:

  A.  November 15th, 2011, for approximately fourteen (14) hours;

  B.  May 26th, 2012, for approximately one (1) hour; and

  C.  July 28th, 2012, for approximately one (1) hour.

183.    As a result of the foregoing, Plaintiff sustained, *inter alia*, physical injuries, physical pain, mental injuries, emotional distress, embarrassment, humiliation, out of pocket expenses, loss of liberty, loss of standing within his community, and deprivation of his constitutional rights.

184.    Accordingly, Plaintiff seeks compensation in an amount to be determined at trial.

<u>THIRD CLAIM FOR RELIEF</u>

<u>VIOLATION OF PLAINTIFF'S FOURTH AMENDMENT RIGHTS
UNDER 42 U.S.C. §1983
ARISING FROM DEFENDANTS' MALICIOUS PROSECUTION OF PLAINTIFF</u>

185.    The Defendant POLICE OFFICERS instituted criminal proceedings against Plaintiff that ended in Plaintiff's favor on the following dates:

  A. May 26th, 2012; and

  B. July 28th, 2012.

186.    There was no probable cause to initiate or continue these prosecutions.

187.    The Defendant POLICE OFFICERS acted maliciously in initiating the proceedings.

188.    Plaintiff was forced to appear before the court on three (3) occasions in order to answer the criminal proceedings that the Defendant POLICE OFFICERS maliciously initiated against him, said dates were as follows:

A.  August 8th, 2012 — Summons No. 432621896 – 4;

B. October 4th, 2012 —— Summons No. 433388912 – 1; and

C.  November 8th, 2012 —— Summons No. 43388912 — 1.

189.    From the Defendant POLICE OFFICERS' "John Does 1-5" constitutionally-violative May 26th, 2012 arrest of Plaintiff, until the day the charges stemming from same were dismissed, August 8th, 2012, Plaintiff was maliciously prosecuted for seventy (70) days.

190.    From the Defendant POLICE OFFICERS' "John Does 6-8" July 28th, 2012 constitutionally-violative arrest of Plaintiff, until the day the charges stemming from same were dismissed, November 8, 2012, Plaintiff was maliciously prosecuted for one-hundred and three (103) days.

191.    Plaintiff was repeatedly and continually deprived of his liberty as a result.

192.    As a result of the foregoing, Plaintiff sustained, *inter alia*, physical injuries, physical pain, mental injuries, emotional distress, embarrassment, humiliation, out of pocket expenses, loss of liberty, loss of standing within his community, and deprivation of his constitutional rights.

193.    Accordingly, Plaintiff seeks compensation in an amount to be determined at trial.

<u>FOURTH CLAIM FOR RELIEF</u>

<u>VIOLATION OF PLAINTIFF'S FOURTH AMENDMENT RIGHTS</u>
<u>UNDER 42 U.S.C. §1983</u>
<u>ARISING FROM DEFENDANTS' USE OF EXCESSIVE FORCE</u>

194.    The Defendant POLICE OFFICERS, on multiple occasions, detained Plaintiff within their custody, using handcuffs that were too tight, and were left on for unreasonable periods of time.

195.    The Defendant POLICE OFFICERS, on multiple occasions, without warning and without reason, tackled Plaintiff, causing significant and painful injury, those occasions were as follows:

A. November 15th, 2011; and

B.  May 26th, 2012.

196.    The Defendant POLICE OFFICERS dragged Plaintiff across the ground, causing his pants and underwear to fall down and causing Plaintiff to suffer significant and painful injuries on November 15th, 2011.

197.    The Defendant POLICE OFFICERS, on multiple occasions, repeatedly struck and punched Plaintiff, causing Plaintiff to suffer significant and painful injuries, those dates were as follows:

A.  November 15th, 2011;

B.  May 26th, 2012; and

C.  July 28th, 2012.

198.    The Defendant POLICE OFFICERS forced Plaintiff's arms behind his back, in a manner intended to break Plaintiff's arms on May 26th, 2012.

199.    The Defendant POLICE OFFICERS slammed Plaintiff against a glass panel within the Chambers street subway station on July 28th, 2012.

27

200.    At no point during the incidents described herein did the circumstances necessitate or support the above applications of force utilized by the Defendant POLICE OFFICERS against Plaintiff.

201.    As a result of the foregoing, Plaintiff sustained, *inter alia*, physical injuries, physical pain, mental injuries, emotional distress, embarrassment, humiliation, out of pocket expenses, loss of liberty, loss of standing within his community, and deprivation of his constitutional rights.

202.    Accordingly, Plaintiff seeks compensation in an amount to be determined at trial.

FIFTH CLAIM FOR RELIEF

VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS
UNDER 42 U.S.C. §1983
ARISING FROM DEFENDANTS' FAILURE TO INTERVENE

203.    The individual Defendant POLICE OFFICERS and Defendant THE CITY OF NEW YORK had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights by the other Defendant POLICE OFFICERS.

204.    The individual Defendant POLICE OFFICERS and Defendant THE CITY OF NEW YORK failed to intervene on Plaintiff's behalf despite having had realistic opportunities to do so.

205.    The Defendant POLICE OFFICERS and Defendant THE CITY OF NEW YORK failed to intervene on Plaintiff's behalf despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

206.    As a result of the foregoing, Plaintiff sustained, *inter alia*, physical injuries, physical pain, mental injuries, emotional distress, embarrassment, humiliation, out-of-pocket expenses, loss of liberty, loss of standing within his community, and deprivation of his constitutional rights.

207.    Accordingly, Plaintiff seeks compensation in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF

VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS
UNDER 42 U.S.C. §1983
ARISING FROM DEFENDANT CAPTAIN SORENSON AND THE DEFENDANT
SERGEANTS "JOHN AND JANE DOE 9-11" ON OR AROUND JULY 18TH, 2012

208.    Defendant CAPTAIN SORENSON and the Defendant SERGEANTS "John and Jane Does 9-11" had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights by the Defendant BROOKFIELD OFFICERS "John Does 1-2."

209.    Defendant CAPTAIN SORENSON and the Defendant SERGEANTS "John and Jane Does 9-11" Defendant THE CITY OF NEW YORK failed to intervene on Plaintiff's behalf despite having had realistic opportunities to do so.

210.    Defendant CAPTAIN SORENSON and the Defendant SERGEANTS "John and Jane Does 9-11" Defendant THE CITY OF NEW YORK failed to intervene on Plaintiff's behalf despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

211.    As a result of the foregoing, Plaintiff sustained, *inter alia*, physical injuries, physical pain, mental injuries, emotional distress, embarrassment, humiliation,

out-of-pocket expenses, loss of liberty, loss of standing within his community, and deprivation of his constitutional rights.

212.     Accordingly, Plaintiff seeks compensation in an amount to be determined at trial.

SEVENTH CLAIM FOR RELIEF

FAILURE TO TRAIN SUBORDINATES AGAINST<br>DEFENDANT CAPTAIN SORENSON AND THE DEFENDANT<br>SERGEANTS "JOHN AND JANE DOES 9-11"

213.     Defendant CAPTAIN SORENSON and the Defendant SERGEANTS "John and Jane Does 9-11" (Collectively, "the Defendant SUPERVISING OFFICERS") were those officers, who by virtue of their position or assignment had authority to supervise Defendant POLICE OFFICER JOSE PEDROZA, Defendant POLICE OFFICER TROMBETTA, Defendant POLICE OFFICER YELLER, the Defendant OWS EVICTION OFFICERS, and the Defendant POLICE OFFICER "JOHN DOES 1-8." (collectively, "The Defendant SUBORDINATE OFFICERS").

214.     The Defendant SUPERVISING OFFICERS were imbued with direct supervision and control over the Defendant SUBORDINATE OFFICERS.

215.     The Defendant SUPERVISING OFFICERS were imbued with authority to train and discipline the Defendant SUBORDINATE OFFICERS.

216.     The Defendant SUPERVISING OFFICERS knew or should have known that the Defendant SUBORDINATE OFFICERS had a propensity to violate the constitutional rights of people with whom the Defendant SUBORDINATE OFFICERS came into contact.

217.    The Defendant SUPERVISING OFFICERS knew or should have known that the Defendant SUBORDINATE OFFICERS needed training in how to refrain from further such misconduct.

218.    The Defendant SUPERVISING OFFICERS were deliberately indifferent to the Defendant SUBORDINATE OFFICERS' need for such training.

219.    As a result of the aforementioned failure to train, Plaintiff's constitutional rights were violated.

220.    As a result, Plaintiff was damaged, harmed and injured, and seeks compensation in an amount to be determined at trial.

<u>EIGHTH CLAIM FOR RELIEF</u>

<u>FAILURE TO SUPERVISE SUBORDINATES AGAINST</u>
<u>THE DEFENDANT SUPERVISING OFFICERS</u>

221.    The Defendant SUPERVISING OFFICERS were imbued with direct supervision and control over the Defendant SUBORDINATE OFFICERS in the performance of their duties.

222.    The Defendant SUBORDINATE OFFICERS reported to the Defendant SUPERVISING OFFICERS.

223.    The Defendant SUPERVISING OFFICERS knew or should have known that the Defendant SUBORDINATE OFFICERS had propensities of violating the constitutional rights of people with whom these officers came into contact.

224.    The Defendant SUPERVISING OFFICERS knew or should have known that the Defendant SUBORDINATE OFFICERS needed supervision to prevent them from committing further such misconduct.

31

225.    The Defendant SUPERVISING OFFICERS failed to effectively discipline the Defendant SUBORDINATE OFFICERS for their misconduct.

226.    The Defendant SUPERVISING OFFICERS failed to correct the Defendant SUBORDINATE OFFICERS for their unconstitutional policing practices.

227.    As a result of the aforementioned failure to supervise, Plaintiff's constitutional rights were violated.

228.    As a result, Plaintiff was damaged, harmed and injured, and seeks compensation in an amount to be determined at trial.

NINTH CLAIM FOR RELIEF

RETALIATION FOR FIRST AMENDMENT
PROTECTED EXPRESSION UNDER 42 U.S.C. § 1983

229.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

230.    Plaintiff, on multiple occasions, engaged in protected speech and conduct.

231.    The Defendant POLICE OFFICERS took adverse action against Plaintiff in response to Plaintiff engaging in protected speech and conduct.

232.    The Defendant POLICE OFFICERS took adverse actions against Plaintiff by using wrongful and unjustified force upon him.

233.    The Defendant POLICE OFFICERS took adverse action against Plaintiff by unlawfully arresting him.

234.    The Defendant POLICE OFFICERS took adverse action against Plaintiff by falsely accusing him of crimes and violations.

235.     The Defendant POLICE OFFICERS took adverse action against Plaintiff by detaining him against his will.

236.     Upon information and belief, there was a causal connection between the protected speech and conduct engaged in by Plaintiff and the adverse actions taken by the Defendant POLICE OFFICERS.

237.     The causal connection between the protected speech and conduct engaged in by Plaintiff and the adverse actions taken against him by the Defendant POLICE OFFICERS was demonstrated by, among other things, the fact that the Defendant POLICE OFFICERS used excessive force against Plaintiff in the absence of justification.

238.     The causal connection between the protected speech and conduct engaged in by Plaintiff and the adverse actions taken against him by the Defendant POLICE OFFICERS was demonstrated by, among other things, the fact that one of the Defendant POLICE OFFICERS "John Does 6-8" stated to Plaintiff, in sum and substance, "Do not film the police again."

239.     The causal connection between the protected speech and conduct engaged in by Plaintiff and the adverse actions taken against him by the Defendant POLICE OFFICERS was demonstrated by, among other things, the fact that one of the Defendant POLICE OFFICERS falsely stated Plaintiff that it is illegal to film the police.

240.     The above-described charges were a pretext intended to justify the Defendant POLICE OFFICERS' illegal arrests of and use of excessive force against Plaintiff.

241.     As a result, a result of the foregoing, Plaintiff sustained, *inter alia*, physical injuries, physical pain, mental injuries, emotional distress, embarrassment,

humiliation, out of pocket expenses, loss of liberty, loss of standing within his

community, and deprivation of his constitutional rights.

242.     As a result of the foregoing, Plaintiff sustained, *inter alia*, physical

injuries, physical pain, mental injuries, emotional distress, embarrassment, humiliation,

out-of-pocket expenses, loss of liberty, loss of standing within his community, and

deprivation of his constitutional rights.

243.     Accordingly, Plaintiff seeks compensation in an amount to be determined

at trial.

TENTH CLAIM FOR RELIEF

MUNICIPAL LIABILITY UNDER <em>MONELL</em><br>UNDER 42 U.S.C. §1983<br>ARISING FROM UNCONSTITUTIONAL MUNICIPAL POLICIES AND<br>CUSTOMS

244.     Defendant THE CITY OF NEW YORK and the NYPD established

official policies directing and promoting unconstitutional practices by NYPD officers,

and have tolerated, condoned and permitted widespread unconstitutional practices by

NYPD officers.

245.     Defendant THE CITY OF NEW YORK indemnifies and shields NYPD

officers who repeatedly and habitually violate constitutional rights, such as the Defendant

POLICE OFFICERS.

246.     Defendant THE CITY OF NEW YORK fails to discipline police

misconduct, thereby insuring that such misconduct continues.

247.    Defendant THE CITY OF NEW YORK implements quotas for individual officers' arrests, thus incentivizing or compelling unconstitutional misconduct by individual officers.

248.    Defendant THE CITY OF NEW YORK tolerates and condones police perjury.

249.    Defendant THE CITY OF NEW YORK implements, tolerates, and fails to punish unlawful, warrantless arrests in violation of the consent decree in Black v. Codd, 73 Civ. 5283 (S.D.N.Y. June 1, 1977), attached hereto as **Exhibit "B."**

250.    Defendant THE CITY OF NEW YORK tolerates and condones the unlawful practice of cover charge arrests for contempt of cop.

251.    These policies and practices caused the unlawful conduct of the Defendant POLICE OFFICERS.

<u>THE CITY OF NEW YORK HAS A POLICY AND PRACTICE OF TARGETING PARTICIPANTS IN OCCUPY WALL STREET ACTIVITIES FOR ARREST WITHOUT CAUSE</u>

252.    According to *The New York Times*, as of June 18th, 2012, over 2,500 participants in Occupy Wall Street activities had been arrested in Manhattan alone.  Upon information and belief, the vast majority of the cases were dismissed or otherwise resolved without criminal penalty.

253.    In other words, over the period of less than a year, Defendant THE CITY OF NEW YORK caused hundreds or thousands of peaceful and non-violent protestors – who had committed no crime -- to be arrested.

254.    Upon information and belief, the NYPD's response to the Occupy movement follows mass arrest policies that were established at the time of the 2004

35

Republican convention, during which over 1,800 people were arrested, with more than 90 percent of the arrest cases being dismissed or ending with not-guilty verdicts.

255.    Upon information and belief, the police have been documented to have filed false criminal charges against others who were arrested during a January 1st, 2012 Occupy Wall Street march.

256.    Upon information and belief, in one such arrest Alexander Arbuckle was arrested on charges that he was standing in the street blocking traffic.  The arresting officer, Officer Elisheba Vera, swore to this version of events on the witness stand at trial.  However, photo and video evidence – including video taken by the NYPD's video unit – demonstrated that Arbuckle was on the sidewalk when he was arrested.  As the magazine *The Nation* reported: "As it turns out, Officer Elisheba Vera lied to the court." Arbuckle was found not guilty.

257.    Upon information and belief, Damien Treffs was a legal observer accompanying the same January 1st, 2012 march.  He was violently arrested without warning.  The District Attorneys office declined to prosecute the case because probable cause was lacking for the arrest.

258.    Upon information and belief, police officers committed perjury in order to press charges against another protestor, Jessica Hall, who was arrested for blocking street traffic on November 17th, 2011.  As *The Nation* reported, the truth exposed at her trial was quite different:  "During trial, Sergeant Michael Soldo told the court that he arrested Hall because she was blocking traffic.  But Soldo later admitted under cross-examination, and the NYPD's own video confirmed, that it was the NYPD metal barricades that prevented vehicles from passing."

36

259.    Upon information and belief, police lied to support the arrest of a protestor arrested at an Occupy-related protest on September 19th, 2011. The protestor was arrested for – according to NYPD spokesman Paul Browne – leaping over a police crowd-control barrier.  Video of the incident, however, showed that the arresting officers reached across the barrier and forcibly dragged the individual over it.

260.    Upon information and belief, Defendant THE CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against persons engaged in the practice of exercising their First Amendment Protected rights to free speech and association.

261.    Upon information and belief, Defendant THE CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against person specifically engaged in the practice of exercising their First Amendment Protected rights to free speech and association while participating in or observing assemblies, marches, and events related to Occupy Wall Street.

262.    In January 2012, the concentrated and collaborative efforts of seven law school clinics throughout the United States founded the *Protests and Assembly Rights Project* in order to "Investigate… the United States' response to Occupy Wall Street in light of the government's international legal obligations."[3]

---

[3] Sarah Knuckley et al., "Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street" (2012). Report incorporated by reference herein and available online at: http://chrgj.org/documents/suppressing-protest-human-rights-violations-in-the-u-s-response-to-occupy-wall-street/

263.     These same concentrated and collaborative efforts helped the *Protests and Assembly Rights Project* draft and thereafter, in July of 2012, publish, "Suppressing Protest: Human Rights Violations In The U.S. Response To Occupy Wall Street" ("The Report"); wherein, the authors state, "In many instances, the… [NYPD] have responded aggressively to nonviolent protests, and have escalated situations —— through arbitrary or misapplications of the law, an excessive police presence, or the use of unwarranted force. The police response has thus . . . undermined basic assembly and expression freedoms [and] [a]t times . . . presented a threat to the safety of New Yorkers." See fn3 at [internal pagination] 71.

264.     In efforts to explain and/or identify the source of the NYPD's "aggressive responses to nonviolent protests", The Report calls attention to the fact that, "in recent years, New York City has witnessed a shift from 'reactive' policing to 'proactive' policing under Commissioner Raymond Kelly's 'Safe Streets, Safe City' initiative…. [meaning] that police adopt measures in advance to minimize the potential impact and size of a protest, which might include preparing a large police force to arrive at a scheduled protest location before the event begins, or regulating permits for the protest in a manner designed to redirect the protest." See fn3 at [internal pagination] 30 (internal citations omitted).

265.     Despite the positive implications in the title of Commissioner Kelly's 'Safe Streets, Safe City' initiative, this 'proactive' form of policing has failed to keep OWS protesters, observers, and bystanders alike safer, but instead, has led to repeated and continuing acts of police officers committing "clear violations of the government's

obligation to uphold assembly and expression rights…. [amounting together to] protest suppression[.]"  See fn3 at [internal pagination] 71.

266.    Further, The Report cites several instances of "Overpolicing and Poor Communication" conducted by the NYPD, where generally "[a]t times, the number of officers on hand [at OWS assemblies, marches, and events] has rivaled or even exceeded the number of protestors . . . repeatedly, the number of visible police [has been] manifestly excessive in comparison to both the peaceful nature of the assembly and the number in attendance at the protests." to wit; "[o]casionally, officers in visibly threatening "hard" uniform (e.g.. body padding, helmets, shields) have attended protests, including small protests posing no evident threat." See fn3 at 82.

267.    Witnesses have observed NYPD officers who have been assigned to perform crowd control duties and overall help provide for individuals' safety instead strike, beat, and otherwise berate civilians without reason, without notice, and without consequence; to wit, "One protestor . . . reported being punched in the left temple by an officer, without any apparent provocation or notice [and thereafter] [t]he punch led to swelling, bleeding, bruising, dizzy spells, and nausea [which required] the individual [to seek] emergency medical treatment[,]" further, "[one legal observer who was also a retired New York Supreme Court judge] . . . witnessed an officer throw a woman to the ground 'out of nowhere' and hit her in the head[,]" and still further, "[one video from an OWS event] shows that an officer approached a woman from behind and grabbed her by the strap of her backpack and her scarf for no apparent reason[;] the officer [then] began to pull the woman towards him . . . for approximately fifteen seconds, and appeared to possibly be choking her via the strap of her scarf [and after this incident] the police

39

appeared not to take any action [against the officer]." <u>See</u> fn3 at 73, 74, and "Appendix I[:] Table of Alleged Police Use of Force Incidents."

268.    The Report posits how, following incidents of police brutality such as these, the conduct of the NYPD in response to OWS assemblies, marches, and events has and continues to cause "[p]rotestors [to] reasonably perceive that they cannot safely protest [and thus remain] constantly on guard for potential arbitrary police force, or decide to leave the assembly[,]"; and as a result OWS participants, observers, and bystanders and civilians generally "view a[n] NYPD officer as someone who can take out [his] baton and beat [an individual] and face no repercussion." <u>See</u> fn3 at 81.

269.    Or further, stated differently by a graduate student who had attended multiple OWS events before and leading up to The Report's publication, "'It's a shock when you expect police to protect you, but you see them beat people . . . [I] grew up thinking that the cops are 'the good guys' but . . . when you see them beat people for no reason, it changes your world. You don't feel safe." <u>See</u> fn3 at 82.

<u>THE NYPD COMPELS ITS OFFICERS TO MEET
UNLAWFUL ARREST QUOTAS,
COMPELLING THOUSANDS OF BASELESS AND UNLAWFUL ARRESTS</u>

270.    The NYPD places emphasis on numbers-driven street-level enforcement of minor violations.[4]

---

[4]    Defendants' [City of New York et al.] Local Civil Rule 56.1 Statement of Undisputed Facts, 08 CIV.  01034 (SAS) [SDNY], docket number 144, filed 2/24/2011, paragraphs 116-131.

271.    Indeed, the use of an explicit quota system has been documented at the several precincts.[5]

272.    This quota system is enforced by the very top levels of the NYPD through the Department's Compstat system.

273.    In a full-page ad on page 15 of the May 7, 2012 edition of the New York Daily News, The Patrolmen's Benevolent Association made clear that the quota pressure comes from the top.   Referring to these quotas, the ad is headlined: "Don't Blame the Cop, Blame NYPD Management."

274.    The NYPD uses Compstat to track such enforcement actions statistically.

275.    The NYPD holds weekly crime strategy meetings, "Compstat Meetings," at which such reports are discussed.[6]

276.    Compstat Meetings are attended by all commanders of Precincts, Police Service Areas, Transit Districts and other operational unit commanders within a given Patrol Borough, including the commanding officers and /or supervisors of precinct-based and specialized investigative units.[7]

277.    Also in attendance are representatives from the District Attorneys' Offices as well as Transit and Housing Bureau Commanders whose jurisdictions lie within the patrol borough, Crime Strategy Coordinators from other patrol boroughs, and ranking

_____

[5]    Fanelli, James, "Cops At Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas For Moving Violations, Memos Say," New York Daily News, November 8, 2010. Article incorporated by reference herein and available online at: http://articles.nydailynews.com/2010-11-08/local/27080554_1_memos-quotas-seat-belt.
[6]    <u>Id.</u>
[7]    <u>Id.</u>

officers from a variety of support and ancillary units (such as the Legal Bureau which do not perform direct enforcement functions.).[8]

278.    The purpose of these Compstat Meetings is for the commanders to direct and modify street-level law enforcement policy based on Compstat statistics.[9]

279.    At these weekly Compstat Meetings, commanders either ratify that the statistics show that the NYPD's street-level activities are correctly implementing the NYPD's stated policies, or street-level deployments are modified to bring these activities in line with such policies.[10]

280.    In this way, the highest-level command of the NYPD exercises granular control over summonses and arrests for minor violations and quality of life offenses, as well as for stop, question and frisk activity.[11]

281.    What street-level police officers do is a direct result of these command-level policies.

282.    As the New York Daily News reported, NYPD supervisors give explicit instructions to street-level enforcement personnel that quantity, not quality, matters – promulgating a policy that comes from the very top of the NYPD hierarchy.  [12]

---

[8]    Id.
[9]    Id.
[10]   Id.
[11]   Id.
[12]   Parascandola, Rocco, "Cops On Tape Pushing Arrest Quotas: NYPD Lt.  Janice Williams captured on tape pushing for more busts, but brass says there's no quotas," The New York Daily News, March 3, 2011.

283. Individual officers have stepped forward to denounce the NYPD's use of quotas, which are illegal.[13]

284. Officers that refuse to meet illegal quotas are subject to adverse employment actions and other retribution from their superiors.[14]

285. The NYPD officially denies that it maintains and enforces quotas.

286. However, the existence of this unconstitutional arrest quota custom and/or policy has been shown by the posting of lists of quantitative targets for various forms of summonses at the 77th Precinct in Brooklyn .[15]

287. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the tape recordings acquired by WABC-TV/DT, in which a 41st precinct sergeant explains that each of his officers is held to a twenty summons per month, and one arrest per month, enforcement quota.[16]

---

[13] Parascandola, Rocco, "Cops On Tape Pushing Arrest Quotas: NYPD Lt. Janice Williams captured on tape pushing for more busts, but brass says there's no quotas," The New York Daily News, March 3, 2011; Parascandola , Rocco, "An ex-Bronx cop Ex-Cop Sues City, Says Quotas Led to Firing: Ex-Bronx cop Vanessa Hicks suing city, says quotas led to axing,"
The New York Daily News, May 2, 2011; Parascandola, Rocco, "79th Precinct cops claim retribution: Nine officers say poor evaluations are payback from commander," The New York Daily News, April 10, 2012.

[14] See id.

[15] Fanelli, James, "Cops At Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas For Moving Violations, Memos Say," New York Daily News, November 8, 2010. Article incorporated by reference herein and available online at http://articles.nydailynews.com/2010-11-08/local/27080554_1_memos-quotas-seat-belt.

[16] Hoffer, Jim, "NYPD Officer Claims Pressure To Make Arrests," WABC News, March 3, 2010. Article incorporated by reference herein and available online at: http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356.

288.    The existence of the aforesaid unconstitutional arrest quota custom and policy may further be inferred from the tape recordings acquired by the Village Voice, including, among other admissions, an 81st precinct sergeant telling his officers to make quota-driven arrests as directed by their superiors even if they must void the arrests at the end of their shifts.[17]

### THE NYPD TOLERATES AND CONDONES WIDESPREAD PERJURY BY ITS OFFICERS

289.    NYPD policy rewards arrests that are based on false statements in criminal complaints sworn by NYPD officers.

290.    As United States District Court Judge Jack Weinstein wrote: "Informal inquiry by [myself] and among the judges of this court, as well as knowledge of cases in other federal and state courts ...  has revealed anecdotal evidence of repeated, widespread falsification by arresting officers of the New York City Police Department."[18]

291.    By its nature, the true extent of police perjury has not been documented. The Mollen Commission in the 1990's found that police perjury was so pervasive that the police even had a word for it: "testilying."[19]

---

[17]    Rayson, Graham, "The NYPD Tapes, Part 2: Bed-Stuy Street Cops Ordered: Turn This Place Into A Ghost Town."   Village Voice, May 11, 2010.  Article incorporated by reference herein and available online at http://www.villagevoice.com/2010-05-11/news/nypd-tapes-part-2-bed-stuy/.

[18]    Marzulli, John, "Judge Jack Weinstein rips NYPD on false arrests as brothers sue for $10M over wrongful narcs bust," The New York Daily News, Nov.  30, 2009.

[19]    Cunningham, Larry, "Taking on Testilying: The Prosecutor's Response to In-Court Police Deception," *Criminal Justice Ethics* Winter/Spring 2009.

292.    Police perjury often involves lying about matters that are outcome determinative in litigation, and that go to the heart of a defendant's guilt or innocence.[20]

293.    Certain types of arrests occur with such frequency that the pattern and practice of police perjury has been at least partially exposed.

294.    In 2008, the New York Times documented at least 20 cases in federal court in which police provided false boilerplate testimony to justify searches and seizures of guns.   These cases represented only that small fraction of cases in which the boilerplate testimony could be challenged with more than the word of the defendant.[21]

295.    The NYPD has taken no steps to disincentivize – much less punish – the practice of perjury that underlies these arrests.   Indeed, the number of such arrests continues to increase.[22]

296.    Nor has the NYPD taken any steps to punish police perjury in other contexts.

297.    There is a nexus between arrest quotas and the NYPD's toleration of police perjury: **police under pressure to make their quota of arrests make false arrests based on perjured accusations in order to do so**.[23]

_____

[20]    Id.
[21]    Weiser, Benjamin, "Police in Gun Searches Face Disbelief in Court," May 12, 2008.
[22]    Parascandola, Rocco and Sarah Armaghan, "Arrests for low-level pot possession higher in 2011 than 2010, despite NYPD directive restricting busts Marijuana arrests near an all-time high," The New York Daily News, February 2, 2012; Beekman, Daniel, Study claims NYPD made hundreds of unlawful pot arrests," The New York Daily News, April 03, 2012.

<u>THE NYPD HAS A POLICY AND PRACTICE OF TOLERATING AND
CONDONING POLICE MISCONDUCT</u>

298.    When the Civilian Complaint Review Board substantiates claims of police

misconduct, The NYPD usually does **not** follow the board's recommendations that

officers guilty of misconduct be given the most serious penalty.  From 2002 to 2010, the

board recommended that 2,078 officers receive the most severe penalty.  That suggested

discipline was given to only 151 officers.[24]  Thus, the Department has set a policy that the

consequences of misconduct will be mild or nonexistent.

299.    This pattern of toleration of violent police misconduct by the NYPD is a

policy and practice of long standing: in 2007, the New York Civil Liberties Union found

that the NYPD's practice if "condoning" police misconduct actually got worse over the

period of time studied (1994-2006).   The NYCLU researchers found:

> ♦    Of the more egregious cases of misconduct that have been
>
> substantiated by the CCRB and referred to the NYPD for disciplinary
>
> action between 2000 and 2004 – the last year for which complete data
>
> [were then] available on disciplinary action – the police commissioner
>
> has rejected the CCRB's findings in 63 percent of those cases.  When

---

[23]     Marzulli, John, "We fabricated drug charges against innocent people to meet
arrest quotas, former detective testifies," The New York Daily News, October 13th 2011.
[24]     Baker, Al, "Independent Agency Gets New Powers to Prosecute New York Police
Officers," March 27, 2012.

discipline was imposed, it was strikingly lenient in light of the severity of the misconduct that has been documented by the CCRB.[25]

300.     Similar indifference to substantiated allegations of police misconduct was documented in a 1998 report by the Human Rights Watch.[26]

### THE NYPD UNLAWFULLY CHARGES INNOCENT PEOPLE WITH 'COVER' CHARGES TO PUNISH "CONTEMPT OF COP"

301.     Upon information and belief, police officers in the City of New York make arrests in the absence of the commission of any crime by the person arrested, motivated by a desire to punish the arrestee for the arrestee's perceived failure to display the degree of deference or subservience demanded by the arresting officers.

302.     Such arrests are frequently referred to as "**contempt of cop**" arrests.

303.     In order to conceal the illegality of these arrests, the victim of the unlawful arrest is charged with a "**cover charge**," usually a low-level crime which does not require a complainant, and whose elements can be established, for the purposes of a criminal complaint, by the officer's own perjured affidavit or testimony.

304.     NYPD police officers have a pattern and practice of charging one or more of a trinity of offenses as their favored cover charges: disorderly conduct, resisting arrest, and obstruction of governmental administration.

---

[25]     Mission Failure: Civilian Review of Policing in New York City (1994-2006), The New York Civil Liberties Union, September 2007.

[26] "Shielded from Justice: Police Brutality and Accountability in the United States," Human Rights Watch, June 1998.   Report incorporated by reference herein and available online at:
http://www.columbia.edu/itc/journalism/cases/katrina/Human%20Rights%20Watch/uspo html/toc.htm.

305.    However, other charges that require no complainant, such as quality of life infractions like open container or excessive noise violations, are also used to cover false arrests.

306.    The New York Times published a special report on the incidence of police brutality as a response to perceived "contempt of cop" by residents of the City of New York, and documented officers' use of cover charges in such cases.[27]

307.    The NYPD has never undertaken any internal study of contempt of cop arrests or cover charges, and statistics on these practices are not available.  However, there is extensive evidence of a widespread practice of false cover charges.

308.    In a case profiled by the CCRB, that board substantiated a quintessential contempt-of-cop/cover charge false arrest: "The board also determined that the second officer improperly drew his gun, failed to provide his name as required by the department's Patrol Guide, and lacked probable cause to issue the disorderly conduct summons, a summons motivated by the man's challenging the officers' actions."[28]

309.    In another such case, the CCRB found that a detective struck a man in the back of the head with a gun when the man questioned the detective.  The man was charged with disorderly conduct, which charges were dismissed.[29]

---

[27]    Sontag, Deborah, and Barry, Dan, "CHALLENGE TO AUTHORITY: A special report: Disrespect as Catalyst for Brutality," New York Times, November 19, 1997.  Article incorporated by reference herein and available online at http://www.nytimes.com/1997/11/19/nyregion/challenge-to-authority-a-special-report-disrespect-as-catalyst-for-brutality.html?pagewanted=all.

[28]    CCRB Case Profiles, available at http://www.nyc.gov/html/ccrb/html/profiles.html (last visited May 15, 2012).

[29]    Id.

310.     In another such case, the CCRB found that without legal justification an officer arrested a man who accidentally bumped into him on the street.  The CCRB found that the officer issued the man a summons charging him with disorderly conduct, and the officer told him, "You're lucky I didn't beat the shit out of you." A court dismissed the disorderly conduct summons.[30]

311.     Indeed, many arrests in violation of the consent decree in **Black v. Codd** are also Contempt of cop arrests where "cover charges" are the only charges filed.

312.     Defendant THE CITY OF NEW YORK and the New York Police Department continue to resist calls for disclosure statistics concerning minor crimes such as the typical "cover charge" crimes.[31]

313.     The NYPD's failure to respond to this well documented problem, and its obstruction of efforts of outside parties to document and address this issue, amount to ratification of the pattern and practice of contempt of cop arrests and excessive force, justified by false cover charges, by the NYPD's agents, employees, and officers.

<u>THESE UNCONSTITUTIONAL POLICES AND PRACTICES RESULTED IN
PLAINTIFF'S INJURY</u>

314.     Upon information and belief, the Defendant POLICE OFFICERS were following Defendant THE CITY OF NEW YORK's policy and practice of targeting

---

[30]     <u>Id.</u>

[31] Rivera, Ray and Baker, Al, "Data Elusive on Low-Level Crime in New York City," The New York Times, Nov. 1, 2010.  Article incorporated by reference herein and available online at http://www.nytimes.com/2010/11/02/nyregion/02secrecy.html?pagewanted=all.

participants in occupy wall street activities for arrest without cause each time they subjected Plaintiff to arrest and excessive force in the manner described herein.

315.    Upon information and belief, the Defendant POLICE OFFICERS were implementing the foregoing unlawful "productivity goals" or arrests quotas custom, practice, and/or policy each time they arrested and detained Plaintiff.

316.    Upon information and belief, the NYPD's practice of tolerating and condoning widespread perjury by its officers, including but not limited to the Defendant POLICE OFFICERS, directly and proximately resulted in Plaintiff being subjected to unlawful arrests and excessive force by the Defendant POLICE OFFICERS in the manner described herein.

317.    Upon information and belief, the NYPD's practice of tolerating and condoning police misconduct by its officers, including but not limited to the Defendant POLICE OFFICERS, directly and proximately resulted in Plaintiff being subjected to unlawful arrests and excessive force by the Defendant POLICE OFFICERS.

318.    Upon information and belief, the NYPD's practice of unlawfully charging innocent people with 'cover' charges to punish "contempt of cop" directly and proximately resulted in Plaintiff being subjected to unlawful arrests and excessive force by the Defendant POLICE OFFICERS.

319.    As a result of the foregoing, Plaintiff sustained, *inter alia*, physical injuries, physical pain, mental injuries, emotional distress, embarrassment, humiliation, out-of-pocket expenses, loss of liberty, loss of standing within his community, and deprivation of his constitutional rights.

320.    Accordingly, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

<u>ELEVENTH CLAIM FOR RELIEF</u>

<u>STATE LAW – BATTERY</u>
<u>AGAINST THE DEFENDANT POLICE OFFICERS</u>

321.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

322.    The Defendant POLICE OFFICERS committed battery upon Plaintiff in their act of making bodily contact with Plaintiff by subjecting him to excessive force in the manner described herein.

323.    The Defendant POLICE OFFICERS performed these acts of making bodily contact with Plaintiff with the intent to do so.

324.    The Defendant POLICE OFFICERS' acts of making bodily contact with Plaintiff were subjectively offensive in nature to Plaintiff.

325.    The Defendant POLICE OFFICERS' acts of making bodily contact with Plaintiff would be objectively offensive in nature to a reasonable person aware of the circumstances of the Defendant POLICE OFFICERS' interaction with Plaintiff.

326.    The Defendant POLICE OFFICERS performed these acts of making bodily contact with Plaintiff without privilege or consent from Plaintiff.

327.    As a result of the Defendants' non-consensual and unprivileged physical contact, Plaintiff sustained, *inter alia*, physical injuries, physical pain, mental injuries,

emotional distress, embarrassment, humiliation, out-of-pocket expenses, loss of liberty, loss of standing within his community, and deprivation of his constitutional rights.

328.    As a result of the foregoing, Plaintiff is entitled to compensatory damages and punitive damages against Defendants in an amount to be determined at trial.

TWELFTH CLAIM FOR RELIEF

STATE LAW – ASSAULT<br>AGAINST THE DEFENDANT POLICE OFFICERS

329.    Plaintiff repeats, reiterate, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

330.    The Defendant POLICE OFFICERS assaulted Plaintiff by putting him in apprehension of imminent harmful and offensive bodily contact.

331.    The Defendant POLICE OFFICERS' act of threatening the use of physical force against Plaintiff put Plaintiff in an apprehension of a battery from the Defendant POLICE OFFICERS.

332.    The Defendant POLICE OFFICERS' act of threatening the use of force against Plaintiff would put a reasonable person aware of the circumstances of the incident in question in an apprehension of a battery from the Defendant POLICE OFFICERS.

333.    As a result of the foregoing, Plaintiff sustained, *inter alia*, physical injuries, physical pain, mental injuries, emotional distress, embarrassment, humiliation, out-of-pocket expenses, loss of liberty, loss of standing within his community, and deprivation of his constitutional rights.

52

334.    As a result of the foregoing, Plaintiff is entitled to compensatory damages and punitive damages against Defendants in an amount to be determined at trial.

## THIRTEENTH CLAIM FOR RELIEF

### STATE LAW – NEGLIGENT HIRING AND RETENTION AGAINST DEFENDANT THE CITY OF NEW YORK

335.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

336.    Upon information and belief, Defendant THE CITY OF NEW YORK failed to use reasonable care in the hiring and retention of the Defendant POLICE OFFICERS who participated in the assault, battery, use of excessive force, unlawful arrests, and other violations of Plaintiff's constitutional rights in the manner described herein.

337.    Defendant THE CITY OF NEW YORK knew, or should have known in the exercise of reasonable care, the propensities of the Defendant POLICE OFFICERS to engage in the wrongful conduct heretofore alleged in this complaint.

338.    As a result of the foregoing, Plaintiff sustained, *inter alia*, physical injuries, physical pain, mental injuries, emotional distress, embarrassment, humiliation, out-of-pocket expenses, loss of liberty, loss of standing within his community, and deprivation of his constitutional rights.

339.    As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## FOURTEENTH CLAIM FOR RELIEF

<u>STATE LAW – NEGLIGENT TRAINING AND SUPERVISION</u>
<u>AGAINST DEFENDANT THE CITY OF NEW YORK</u>

340.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

341.     Upon information and belief, Defendant THE CITY OF NEW YORK failed to use reasonable care in the training and supervision of the aforesaid Defendant POLICE OFFICERS who participated in the assault, battery, use of excessive force, unlawful arrests, and other violations of Plaintiff's constitutional rights in the manner described herein.

342.     Defendant THE CITY OF NEW YORK knew, or should have known that the requirements, guidelines, and terms of its training for the Defendant POLICE OFFICERS were inadequate to prevent the Defendant POLICE OFFICERS from engaging in the wrongful conduct against Plaintiff heretofore alleged in this complaint.

343.     As a result of the foregoing, Plaintiff sustained, *inter alia*, physical injuries, physical pain, mental injuries, emotional distress, embarrassment, humiliation, out-of-pocket expenses, loss of liberty, loss of standing within his community, and deprivation of his constitutional rights.

344.     As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

<u>FIFTEENTH CLAIM FOR RELIEF</u>

<u>STATE LAW – RESPONDEAT SUPERIOR</u>

345.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

346.     The acts complained of were carried out by the aforementioned Defendant POLICE OFFICERS in their capacities as police officers, officials, and agents of Defendant THE CITY OF NEW YORK.

347.     As a result, Plaintiff sustained physical, mental, and emotional injuries in the manner described herein.

348.     The acts complained of were carried out by the aforementioned Defendant POLICE OFFICERS in their capacities as police officers and officials in the course of their employment by Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

349.     As a result, Defendant THE CITY OF NEW YORK is liable to Plaintiff for the injuries and other damages caused by its police officers, officials, and agents on a theory of *respondeat superior.*

350.     As a result of the foregoing, Plaintiff sustained, *inter alia*, physical injuries, physical pain, mental injuries, emotional distress, embarrassment, humiliation, out-of-pocket expenses, loss of liberty, loss of standing within his community, and deprivation of his constitutional rights.

## SIXTEENTH CLAIM FOR RELIEF

## PUNITIVE DAMAGES AGAINST THE DEFENDANT POLICE OFFICERS

351.    The actions of the Defendant POLICE OFFICERS constituted intentional violations of federal and state law.

352.    The actions of the Defendant POLICE OFFICERS were motivated by evil motive or intent, or involved involves reckless or callous indifference to the constitutionally protected rights of Plaintiff.

353.    As a result, Plaintiff is entitled to an award of punitive damages against each of the individual Defendant POLICE OFFICERS in an amount to be determined at trial.

354.    As a result of the foregoing, Plaintiff sustained, *inter alia*, physical injuries, physical pain, mental injuries, emotional distress, embarrassment, humiliation, out-of-pocket expenses, loss of liberty, loss of standing within his community, and deprivation of his constitutional rights.

355.    Therefore Plaintiff is entitled to punitive and compensatory damages.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Empanel a jury.

[d] Award attorney's fees and costs.

[e] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:      New York, New York
            April 30, 2013

Respectfully submitted,

DAVID A. THOMPSON [DT 3991]
STECKLOW COHEN & THOMPSON
10 SPRING STREET – SUITE 1
New York, New York 10012
[212] 566-8000
[212] 202-4952/FAX
DTHOMPSON@WYLIELAW.COM
ATTORNEY FOR PLAINTIFF